Mark Christian HENDERSON *v.* STATE of Arkansas

CR 82-155                                      652 S.W.2d 16

Supreme Court of Arkansas
Opinion delivered June 13, 1983

*Philip M. Clay* and *James C. Graves,* for appellant.

*Steve Clark,* Atty. Gen., by: *Theodore Holder,* Asst. Atty. Gen., for appellee.

ROBERT H. DUDLEY, Justice. Mark Christian Henderson, the appellant, was convicted of the January 30, 1982, capital felony murders of Steve Francis and Diane Francis in Arkadelphia. He was sentenced to life imprisonment without parole. We reverse and remand for a new trial. Jurisdiction in is this Court pursuant to Rule 29 (1) (b).

We first address appellant's meritorious argument that the trial court erroneously limited cross-examination of the accomplice.

Two people were murdered during the course of a robbery. The appellant, Mark Henderson, was charged with both capital felony murders. He was subjected to the penalties of death or life imprisonment without parole. Ark. Stat. Ann. § 41-1501 (Repl. 1977). In contrast, Jeffrey A. Brown, an admitted accomplice, was allowed to plead guilty to murder in the first degree which carries a penalty of not less than ten nor more than forty years, or life with the possibility of parole. Ark. Stat. Ann. §§ 41-901 and 41-1502

(Supp. 1981). The admitted accomplice, who had been allowed to plead guilty to the lesser charge, took the stand during the State's case-in-chief and testified that the appellant was the one who actually murdered the victims. The defense attorney, in cross-examining the accomplice, asked, "What kind of a deal are you getting for yourself, Mr. Brown?" The prosecuting attorney objected and the court sustained the objection.

The ruling was erroneous. We have consistently taken the view that full cross-examination should be allowed in order to show bias. *Simpson* v. *State*, 274 Ark. 188, 623 S.W.2d 200 (1981). This is especially true in the case of an accomplice since his testimony is the direct evidentiary link between the defendant and the crime. *Rhodes* v. *State*, 276 Ark. 203, 634 S.W.2d 107 (1981). In *Klimas* v. *State*, 259 Ark. 301, 305-06, 534 S.W.2d 202, 205 (1976), we stated:

> It is generally permissible for a defendant to show by cross-examination anything bearing on the possible bias of the testimony of a material witness. *Bethel* v. *State*, 162 Ark. 76, 257 S.W. 740; *Ringer* v. *State*, 74 Ark. 262, 85 S.W. 410; Annot. 62 A.L.R.2d 611 (1958). This rule applies to testimony given under expectation or hope of immunity or leniency or under the coercive effect of his detention by authorities. *Stone* v. *State*, [162 Ark. 154, 258 S.W. 116]; *Boyd* v. *State*, [215 Ark. 156, 219 S.W.2d 623]. See also *Campbell* v. *State*, 169 Ark. 286, 273 S.W. 1035; *Alford* v. *U.S.*, [282 U.S. 687 (1930)]. The test is the expectation of the witness and not the actuality of a promise. *State* v. *Little*, [87 Ariz. 295, 350 P.2d 756]; *Spaeth* v. *United States*, 232 F.2d 776, 62 A.L.R.2d 606 (6 Cir., 1956).

\* \* \*

Denial of cross-examination to show the possible bias or prejudice of a witness may constitute constitutional error of the first magnitude as violating the Sixth Amendment right of confrontation. *Davis* v. *Alaska*, 415 U.S. 308, 94 S. Ct. 1105, 39 L.Ed.2d 347 (1974).

Indeed, the State does not contest the argument that the ruling was erroneous. Instead, it contends that no proffer was made and thus no reversal should be had on this point. Ark. Unif. Rules of Evid. 103 (a) and 103 (a) (2) provide:

> Rule 103. Rulings on evidence. — (a) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

> * * *

> (2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

Normally, we will not consider a point involving the exclusion of evidence when there was no proffer of excluded evidence because we have no way of knowing the substance of the evidence. *Parker* v. *State,* 268 Ark. 441, 597 S.W.2d 586 (1980). However, there is no need for a proffer in either of two situations. First, there is no need for a proffer where the substance of the offer was apparent from the context within which the questions were asked. Rule 103 (a) (2). Here, the distinction between charges of capital felony murder with a possible sentence of death and murder in the first degree with a maximum sentence of forty years or life with the possibility of parole is obvious to one trained in law. A jury is not trained in criminal law and might not understand that the accomplice may well have taken a desperate option and prevented risking his own life by blaming the appellant. This is the very type of evidence of bias which the defendant is entitled to present for a jury to weigh. The substance of the answer to the question objected to is apparent to us. Second, in this situation it is normally only the prosecutor and the accomplice who know what expectation, if any, the state is holding out for the accomplice. The defendant and his attorney do not usually have this information. Rule 103 (a) (2) does not contemplate a proffer of evidence when the information is unavailable to the cross-examiner. The

exclusion of evidence of possible bias or possible prejudice by the accomplice is sufficient. A proffer was not necessary.

The error is prejudicial and requires that we reverse the case. However, we must also address appellant's next argument in great detail because, he argues, it requires not only reversal but also dismissal. That issue is whether there was sufficient corroboration, independent of the testimony of the admitted accomplice, to sustain the conviction.

The testimony of an accomplice must be corroborated by other independent evidence which tends to connect the defendant with the commission of the crime. It is not sufficient to prove that the crime was committed and the circumstances of the crime. Ark. Stat. Ann. § 43-2116 (Repl. 1977); *Pollard* v. *State,* 264 Ark. 753, 574 S.W.2d 656 (1978). The test for determining the sufficiency of corroborating evidence is whether, if the testimony of the accomplice were totally eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *Bly* v. *State,* 267 Ark. 613, 593 S.W.2d 450 (1980), *citing Froman* v. *State,* 232 Ark. 697, 339 S.W.2d 601 (1960); *Anderson* v. *State,* 256 Ark. 912, 511 S.W.2d 151 (1974). Corroboration must be evidence of a substantive nature since it must be directed toward proving the connection of the accused with the crime and not directed toward corroborating the accomplice's testimony. *Olles* v. *State,* 260 Ark. 571, 573, 542 S.W.2d 755, 758 (1976), *citing Yates* v. *State,* 182 Ark. 179, 31 S.W.2d 295 (1930). In addition to being substantive, the corroborating evidence must be substantial. *Olles,* at 573, 542 S.W.2d at 757. Substantial evidence is stronger evidence than that which merely raises a suspicion of guilt. It is evidence which tends to connect the accused with the commission of the offense charged. However, it is something less than that evidence necessary in and of itself, to sustain a conviction. *Olles,* at 573, 542 S.W.2d at 757-58; *Klimas* v. *State,* 259 Ark. 301, 534 S.W.2d 202 (1976). The corroborating evidence may be circumstantial, but it must be of a material nature and legitimately tend to connect the accused with the commission of the crime. *Pollard* at 756, 574 S.W.2d at 658, *citing Roath* v. *State,* 185 Ark. 1039, 50 S.W.2d 985 (1932).

Corroboration may be furnished by the acts, conduct, declarations or testimony of the accused. *Olles*, at 574, 542 S.W.2d at 758. False statements to the police and flight by an accused may constitute corroborating evidence. *Bly*, at 619-20, 593 S.W.2d at 454. On the other hand, an explanation by the accused of suspicious circumstances may be considered in determining whether the corroborating evidence is sufficient. *Olles*, at 575, 542 S.W.2d at 759, *citing King* v. *State*, 254 Ark. 509, 494 S.W.2d 476 (1973).

To test the sufficiency of the corroborating evidence in this case we eliminate the testimony of Jeffrey Brown, the accomplice, and determine whether the testimony of the other witnesses establishes the crime and tends to connect the accused with the commission of that crime.

Brian Francis, the older brother of victim Steve Francis, testified that Steve was a regular seller and consignor of marijuana. Often he would consign marijuana to comeone in order for that person to resell it and pay him. Brian Francis testified that on the evening of January 30, 1982, Steve Francis had between an ounce and two and one-half ounces of marijuana in a brown bag. Steve also had $90 in his billfold. Robert Cooper and Mark Batson, both Arkadelphia policemen, testified that they found the victims Steve Francis and Diane Francis in their Chevrolet automobile on Hunter Street in Arkadelphia shortly after 5:00 a.m. on January 31. Both were dead. Dr. Fahmy A. Malak, the State Medical Examiner, testified that both victims died between 10:00 and 11:00 p.m. on January 30, 1982 from contact gunshot wounds to their heads. He removed the bullet fragments and supplied them to the State Crime Laboratory.

Ralph Turbyfill, the Chief Latent Fingerprint Expert with the State Crime Laboratory, examined the victims' Chevrolet automobile but found only the victims' fingerprints. He found mud on the back seat floorboard which indicated at some time someone entered the back seat from the passenger side and exited on the driver's side. He also found the brown bag in which the victim usually kept

marijuana. It contained one plastic bag containing marijuana and a number of unused baggies.

Jack Ursery of the Arkansas State Police searched the pockets of the victims' clothing and found only four pennies in one of Steve Francis' pockets. His billfold did not contain any money. This chain of evidence establishes the murders in the course of robbery and proves the circumstances surrounding the crime. However, it does not tend to connect appellant with the crimes.

The following evidence tends to connect the appellant with the robbery and murders. Don Holmes, appellant's half-brother, testified that for six weeks prior to the murders appellant had lived in a room of his home. Holmes identified a .22 caliber pistol which he had kept under a diaper box and discovered missing four weeks before the crimes. One week later, three weeks before the crimes, he found the gun in his home and hid it under his mattress. The day after the murders, the police came to his house to search appellant's room. The fully loaded .22 caliber pistol was still under Holmes' mattress. He gave the pistol to the police.

Robert Phillips, the Firearms and Tool Mark Examiner with the State Crime Laboratory, testified that he performed a comparison of the bullets removed from the victims and test bullets fired from Holmes' .22 caliber pistol and he could neither identify nor eliminate the pistol as the one which fired the fatal bullets but testified that the fatal bullets were fired "from this weapon or one just like it."

Jeff Buford testified that on the night of January 30 he drove to the Holmes residence for the purpose of visiting appellant. He stated that the Francises' Chevrolet automobile was parked in front of that residence and he parked about one and one-half car lengths from their car. He testified that he did not see either of the victims. On direct examination he stated that the time of this observation was between 9:45 and 10:20 p.m. but on cross-examination he stated that he did not have a watch on and his car did not have a clock but guessed that it was later than 9:00 p.m. and before 11:00 p.m. He testified that the appellant stated he

was about to purchase a quarter of a pound of marijuana and would meet him later at a car wash and sell some of it to him. However, appellant never met him at the car wash.

Ricky Arnold and Bruce Golden testified that around 11:00 p.m. the appellant was at Arnold's apartment. Golden testified that at that time the appellant had a zip-lock bag half full of marijuana while Arnold testified that the bag was full. Both testified that the appellant left Arnold's apartment within the hour. Around midnight, and after appellant had left, Arnold and Golden went to a local nightclub, the Watergate Club. There Arnold saw the appellant rolling a marijuana cigarette.

Charles Lambert, a criminal investigator for the Arkansas State Police, testified that he and Sergeant Jack Ursery interviewed appellant in North Little Rock three days after the crimes and appellant denied that he had known the victims, denied that he knew the accomplice and denied having any marijuana on the night of the crimes.

The appellant testified that his livelihood came from collecting welfare and selling marijuana. He stated that Steve Francis, one of the victims, was his regular supplier of the drug and on the evening of the crimes came by to sell him $90 worth of marijuana. Appellant stated that he paid $30 at the time and Francis gave him $60 credit until the next morning. He intended to sell the marijuana that night at the Watergate Club. He stated that the Francises then drove away and he went to Lavonne Todd's house, then to Bennie Lee Barnes' house, then to Ricky Arnold's apartment and then to the Watergate Club to sell the marijuana. He admitted to having about $100 in cash at the club and admitted he had only $30 earlier. He testified that he acquired the money from marijuana sales but could account for only one $5 sale. The next morning he waited for Francis to come by his residence to collect the $60. He waited until 2:30 in the afternoon and he and the accomplice went to his cousin's house in Hot Springs "to party." After that he went to a relative's home in North Little Rock. He said he was not attempting to flee as he did not take all of his clothes; he took only one pair of pants and two shirts. Appellant denied

killing the Francises. He testified that he had no motive to kill them because Steve Francis was his main supplier of marijuana.

Appellant readily admitted trying to pawn his half-brother's pistol some weeks before the crimes as described by Doug White. He stated this was done in order to get money to purchase marijuana. He admitted lying to the police about knowing Steve Francis because he thought he was being arrested for selling marijuana which he had purchased from Francis.

The summary of testimony establishes six items of evidence to be weighed in order to determine if there is something more than suspicion for corroboration. Those six are as follows: (1) Appellant was seen standing near the victims' family automobile for a short period of time. The time was estimated by the witness to be as early as 9:00 and as late as 10:20 p.m. The estimate of the time of death of the victims is between 10:00 and 11:00 p.m. Therefore, appellant could have been near the victims' car shortly before or as much as two hours prior to the deaths. The jury may have concluded these times coincided and that inference is permissible under the proof. (2) Appellant possessed half of a bag of marijuana shortly after one of the victims had been robbed of his marijuana. This possession of marijuana could be viewed as incriminating when examined with the other evidence. (3) Appellant had access to Don Holmes' .22 caliber pistol. The victims were murdered with shots fired from a .22 caliber pistol. (4) At 2:30 on the afternoon following the murders the appellant went to Hot Springs and later to North Little Rock. He had not returned on February 3 when suspicion began to center on the accomplice and him. He had not told his half-brother, Don Holmes, he was leaving town. (5) Appellant, upon first being questioned, gave the police a statement which included three pieces of false information: (a) he denied that he knew the victims; (b) he denied that he knew the accomplice, Jeffrey Brown; and (c) he denied having any marijuana on the night in question. Appellant's explanation of the above factors may be considered in determining whether there is a sufficient link in a chain of circumstances making the

corroborating evidence sufficient. In his testimony he admitted that he lied about all three points when he was first questioned. He stated that he thought the police were there to arrest him for selling drugs which he had purchased from Steve Francis. The credibility of appellant's explanation of why he gave false statements was for the jury to decide. (6) Appellant's friend, Jeff Buford, was a reluctant witness for the State. He testified that as he was driving by appellant's house, he saw appellant coming out to the Francis vehicle. When appellant saw Buford he flagged him down and had a conversation with him: "He kind of told me what was going on, that he was going to get some marijuana, a quarter of a pound, and to meet him at the car wash in an hour. He didn't say where he was going to get this quarter of a pound, but he said he was going to get. He was going to cop one, is what he said." On cross-examination Buford tried to minimize the word "cop" as meaning "to buy." But the word is well recognized as a slang for "steal." Webster's New Unabridged Dictionary, 2d Edition, defines "cop" as "to steal, or to rob, especially on the spur of the moment."

The corroborating evidence is sufficient to sustain the conviction. Therefore, even though prejudicial error occurred in limiting cross-examination, we only reverse and remand for new trial.

Most of the other assigned points of error are not likely to arise again upon retrial. The issues regarding the qualification of the jury for the death penalty are now moot. *Fuller* v. *State*, 246 Ark. 704, 439 S.W.2d 801, *cert. denied,* 396 U.S. 930 (1969); *Sneed* v. *State,* 159 Ark. 65, 255 S.W. 895 (1923).

Reversed and remanded.

HAYS, J., dissents.

STEELE HAYS, Justice, dissenting. I disagree that this case should be reversed simply because the trial court sustained an objection to a question which may have been objectionable. The question — "What kind of deal are you getting for yourself, Mr. Brown?" — is, at best, argumenta-

tive and the ruling may have been prompted by the form of the question. Had counsel asked questions of the witness in proper form with respect to a negotiated plea, the matter would have been relevant and, doubtless, admitted by the trial court. The fact that the trial court was not denying the defense the right to question the witness concerning a trade-out for his testimony is demonstrated by the follow-up question, "Mr. Brown, you expect to be out of jail fairly soon don't you, sir?" If the point was deemed important to the defense, the issue should not have been abandoned so abruptly.

Even if the ruling was technically incorrect, which is debatable, it fails to meet the requirement of Rule 103 of the Uniform Rules of Evidence, that error may not be predicated on a ruling which admits or excludes evidence unless a *substantial* right of the party is affected. Counsel heard the comment from the prosecutor, "There's no deal." He could easily have asked the witness whether *he* had any understanding or expectation of leniency, yet he chose not to do so and I would not impose the heavy burden of another trial simply to provide a second opportunity for one which was originally declined.